## MARSHALL BLACKWELL v. STATE.

No. A-7485.   Opinion Filed July 19, 1930.
(290 Pac. 352.)

Cress, Tebbe & Cress, for plaintiff in error.

J. Berry King, Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter for convenience called the defendant, was by information charged with Floyd Burgell, Tom Burgell, George Griffith, and D. P. Owen, with unlawfully, willfully, wrongfully, and knowingly manufacturing intoxicating liquor, with the unlawful and willful intent on the part of the defendants to barter, sell, give away, and otherwise dispose of the same unlawfully, was separately tried and convicted, and sentenced to pay a fine of $150 and be imprisoned in the county jail for 30 days. From the sentence and judgment the defendant has appealed to this court.

The testimony on behalf of the state, in substance, is as follows:

H. H. Isham, sheriff of Noble county, stated:

"On the 9th day of January, 1929, Roy Hileman, Fred Yeager, and I went to a place eight miles northeast of Perry to search for a still; I arrived about 6:30 in the evening; Mr. Owen was on the corner of the porch; I searched the house and found a large still, barrels of mash, pressure tank, cooler, some whisky and coils; the still was warm, and under it was a gasoline burner and pressure tank; I remained in the house about twenty minutes, and left Deputy Hileman in charge of Mr. Owen, George Griffith, and the two Burgells, and went with Mr. Yeager to phone; I was gone about an hour, and when I returned I found Marshall Blackwell and Mr. Dronberger and his wife and daughter there; Mr. Blackwell was courteous enough to haul the whisky we found to town for me; I told Mr. Blackwell I would hold him because I found a pressure tank and burner, and some fruit jars in his car, which made it look like he was implicated."

Roy Hileman testified, in substance, the same as Fred Yeager and H. H. Isham. Hileman further stated that

Yeager and Isham left the house and he remained with the prisoners; that shortly after Yeager and Isham left Mr. Blackwell drove up in his car, and a short while thereafter Mr. Dronberger and his wife and baby came; "Mr. Blackwell had some groceries in some cartons in his car, and I told him I would have to hold him until the sheriff got back."

At the close of the state's testimony, the defendant moved for a directed verdict on the ground and for the reason that the evidence was wholly insufficient to show facts to connect the defendant with the offense, or to show any connection on his part with the manufacture or possession of the liquor in question, or any of the stuff found by the officers, which motion was overruled, and defendant excepted. The defendant then moved the court to direct a verdict of acquittal, on the grounds and for the reason all the evidence obtained being obtained unlawfully by a search and seizure of the residence in the nighttime by the officers, which motion was overruled, and exceptions allowed.

The defendant called Tom Burgell, who stated that the still and liquor belonged to himself and D. P. Owen, that the defendant, Blackwell, was never in the stone house on the place where the raid was conducted before the night he was arrested; that "on the 8th of January, 1929, I was in Ponca City and purchased some groceries; I saw Blackwell there and asked him when he was going down to his place near the Casparis ranch, and he told me that night or the next morning, and I asked him if he would bring the stuff down to me; I did not tell Mr. Blackwell about the jars, pressure tank, or burner; I told him there was some stuff I wished he would bring down; I met Mr. Blackwell in Ponca City about noon; Mr. Blackwell had never hauled anything for me before;

I had known him for a couple of years, had never worked for him; I had been at the stone house with Mr. Owen two or three weeks before I got the still; I helped Mr. Owen with the chores; Mr. Griffith came to the stone house the night of the raid."

Jesse Rorabaugh testified on behalf of the defendant that on January 8 and 9, 1929, and for some four months prior "I had worked for Mr. Blackwell on his 50-50 ranch, which is located about five miles southeast of Marland; Mr. Blackwell went to Ponca City the morning of the 8th, leaving about 9 o'clock and returning about 2 o'clock in the afternoon, and helped me fix fence that afternoon; he remained at home that evening and over night, and on January 9th he went to Ponca City about 11 o'clock in the morning and returned about 4 o'clock in the afternoon; on the evening of the 9th he said he was going to my father's to see about renting the place to him; this place is located north of the Jake Casparis ranch; my father has this section of land leased from Mr. Blackwell, there is a hay meadow and 160 acres in cultivation."

On cross-examination, witness stated he worked for Mr. Blackwell four months prior to the raid and was still working for him; "Mr. Blackwell went to Ponca City on the 9th of January, and came back about 4 o'clock; he was driving a Ford; I did not look in the Ford; Mr. Blackwell remained at home until after supper and left, stating he was going to see my father about renting the place to him."

The defendant testified in his own behalf that his home was five miles southeast of Marland on what is known as the 50-50 ranch; "I have some sheep, horses, and cattle on the ranch, and 150 acres in cultivation; on January 8, 1929, I saw Tom Burgell in Ponca City, and he

asked me when I was going down to the Casparis place; Burgell told me he was living down there, and I told him I would go down in a day or two, and he asked me to bring some groceries down for him, and I told him I would; he said the groceries would be at Art Gibbs' grocery at the end of the pavement on the Ponca City and White Eagle road; I had never been to this stone house where this still was located before the night of January 9, 1929; I stopped at the Gibbs Grocery, and Arthur Gibbs put some things in the back of my car and I went home; after supper I went down to see Mr. Rorabaugh; I had been negotiating with him about renting the place, and I wanted to tell him he could have the place; Mr. Rorabaugh was living on the adjoining place to the place on which this stone house was located; I stopped to leave the groceries, and, as I walked into the stone house, Mr. Hileman said I was arrested; I did not know a still was there, knew nothing about the place; I did not know Mr. Burgell was making whisky; I did not know Mr. Owen before that night; I knew Tom Burgell and Tom's father; I had known Tom for about two years."

On cross-examination, the defendant stated: "Tom Burgell has never worked for me; there was no one with Tom on the 8th of January when I saw him in Ponca City; I talked with him about five minutes; Tom told me he had some groceries he wished I would bring down for him; I did not know what kind of groceries; I paid no attention to what Art Gibbs, the proprietor of the grocery store, put in my car; my Ford coupe has a back end to it, and Mr. Gibbs put several things in the car; it is not unusual for farmers to have pressure tanks to use on their stove; Mr. Tiger, who works for the 101 ranch, and Emmit Soldani uses one; hardware stores both in Marland and Ponca City sell stoves you can attach these pres-

sure tanks to; I knew nothing about there being any mash in the stone house where Owen and Burgell was living; I was to go by there and leave the groceries and go on to my place where Mr. Rorabaugh lived; when I arrived there Mr. Hileman told me I was under arrest and I told him all right; that was about 30 minutes before the sheriff came; Mr. Isham asked me what business I had, and I told him I did not have any business there; then the sheriff said he would have to take me to jail."

The defendant has assigned 22 errors alleged to have been committed by the trial court. The view we take of this record it is only necessary to consider the 17th and 18th assignments of error, which are as follows:

"17. That the verdict is contrary to law.

"18. That the verdict is contrary to the evidence."

The defendant insists that the evidence of the state is wholly insufficient to sustain the judgment and sentence against him, for the reason that there is no testimony connecting the defendant with the manufacture of any whisky. The testimony on behalf of the state shows that the sheriff and his deputies went to the house where D. P. Owen and Tom Burgell and others were, and searched the same and found whisky, a still and other property; that, after the search had been made, the sheriff and one of his deputies had gone, as they say, to phone; the defendant, Marshall Blackwell, drove up, as shown by the record, for the purpose of delivering some things he had brought from Ponca City for Tom Burgell; the defendant was not the only one who came to the house after the search was made, but the Dronberger family also came and were held by the officers for a time; the officers said the reason they held the defendant was they found some groceries and other things in the defendant's

car. The record discloses that D. P. Owen and Tom Burgell, who was jointly charged with this defendant, testified that the defendant had nothing to do with the properties found by the officers, had no interest in them, and had no knowledge a still was in operation; that defendant came to deliver the things Tom Burgell asked him to bring out from Ponca City. Defendant accounts for his whereabouts on the 8th and 9th, previous to the search on the 9th, and the defendant tells where he was and how it came that he agreed to bring the things down to Mr. Burgell when he went down to Mr. Rorabaugh's to see about renting a farm to him.

The state offered no testimony to show that the defendant had anything to do with the making of the whisky it is claimed was found at the house, or to show he had anything to do with the manufacture of the whisky, or the still, or the premises on which the still was located. The only evidence upon behalf of the state against the defendant is the fact that he had some stuff in his car that he brought down to the place that might be used in the manufacture of whisky. This is a circumstance, if unexplained, would be sufficient to create a suspicion of the defendant's guilt, or at least of the knowledge of the defendant that the parties at the house were engaged in the manufacture of whisky, but the reason for the defendant having these things in his car is fully explained by Tom Burgell and the defendant, and the state offered no testimony to contradict the explanation made by Burgell and the defendant as to how it happened the defendant brought the things he had for Burgell to the place the officers searched. This court has often held that the questions of fact are for the jury, and, where the evidence, although conflicting, reasonably sustains the verdict and judgment, it will not be disturbed in this court for insuffi-

·ciency. However, unless the evidence is such that the jury may reasonably and logically find the guilt of the defendant, a verdict will be set aside. La Grone v. State, 32 Okla. Cr. 45, 239 Pac. 938; Cowan v. State, 32 Okla. Cr. 149, 240 Pac. 660; Bailey v. State, 37 Okla. Cr. 317, 258 Pac. 358, 359; Jordan et al. v. State, 41 Okla. Cr. 193, 270 Pac. 863.

Upon a careful examination of all the evidence, we hold that the evidence is not sufficient to sustain the verdict of guilty, that the evidence falls far short of that certainty required to convict in criminal cases. Lunsford v. State, 38 Okla. Cr. 233, 260 Pac. 514; Tipton v. State, 38 Okla. Cr. 74, 258 Pac. 1053.

For the reasons herein stated, the case is reversed.

EDWARDS, P. J., concurs. CHAPPELL, J., not participating.